**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re Application of LUCILLE HOLDINGS PTE. LTD. under 28 U.S.C. § 1782 | ) ) ) ) )    Miscellaneous Case No. 1:21 mc-0099 (GMH) |

## APPLICANT LUCILLE HOLDINGS PTE. LTD.'S REPLY IN FURTHER SUPPORT OF APPLICATION FOR DISCOVERY

## Table of Contents

Table of Authorities ........................................................................................................... ii

Argument ............................................................................................................................ 1

I.  Lucille has met the requirements of 28 U.S.C. § 1782(a) ................................... 1

    1.  Whether the statutory requirements of 28 U.S.C. § 1782(a) must be met before a federal court has subject matter jurisdiction to address an application for discovery under the provision (no). ........................................................................ 1

    2.  Whether, if not strictly jurisdictional, the statutory requirements of 28 U.S.C. § 1782 must nevertheless be met as of the date the application is filed in order for a federal court to have the authority to resolve an application for discovery under that provision (no) ......................................................................................... 3

    3.  If those requirements are not jurisdictional and do not otherwise limit the authority of a federal court to address such an application, whether compliance with those requirements can be waived or forfeited by the target of the application (yes) and, if so, whether Edge Asset Management LLC has waived or forfeited such compliance (yes) .............................................................................. 5

    4.  Whether notwithstanding whether the requirements of 28 U.S.C. § 1782(a) are jurisdictional or nevertheless must be met before a federal court has authority to address an application for discovery under the provision, at what point in time should that assessment be made—as of the date the application was filed, as of the date the court resolves the application, or as of some other date (the Court should address them as of the date it resolves the application). ..................... 8

    5.  Whether Lucille (a) had met the requirements of 28 U.S.C. § 1782 as of the date of the application (yes), (b) had met the requirements of 28 U.S.C. § 1782 as of the date of the discovery hearing in this case (yes), or (c) will meet the requirements of 28 U.S.C. § 1782(a) as of some other date it proposes should be the relevant date (yes). .................................................................................... 9

II.  The discovery Lucille seeks is reasonable and should be permitted .............................. 14

    1.  The Court should order Edge to produce the requested emails and attachments .... 15

    2.  The Court should order Mr. Siegel and Ms. Sanders to give individual depositions ...................................................................................................... 19

    3.  Edge fails to show that the requested discovery would be unreasonable, disproportional, or unduly burdensome and it should be required to provide discovery at its own cost ........................................................................................ 20

III.  Conclusion ............................................................................................................ 23

# Table of Authorities

Page(s)

## Cases

*Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113 (2d Cir. 2015)............................................................................3, 4

*Cox v. Saul*,
No. 1:18-CV-02389-KBJ-GMH, 2020 WL 9439356 (D.D.C. Sept. 1, 2020)............................7

*Hisp. Affs. Project v. Perez*,
206 F. Supp. 3d 348 (D.D.C. 2016) ....................................................................5

*In re Application of Furstenberg Fin. SAS*,
334 F. Supp. 3d 616 (S.D.N.Y. 2018) ................................................................10

*In re Application of Leret*,
51 F. Supp. 3d 66 (D.D.C. 2014)..................................................................3, 5, 22

*In re Auld*,
689 F. App'x 623 (10th Cir. 2017) .....................................................................5

*In re FTC Line of Bus. Rep. Litig.*,
626 F.2d 10229 (D.C. Cir. 1980)........................................................................4

*In re Hansainvest Hanseatische Inv.-GmbH*,
364 F. Supp. 3d 243 (S.D.N.Y. 2018) ..........................................................3, 12, 20

*In re Hornbeam Corp.*,
No. 14-24887-MC, 2018 WL 1998912 (S.D. Fla. Apr. 27, 2018) .....................................3, 10

*In re Letter of Request from Crown Prosecution Service of United Kingdom*,
870 F.2d 686 (D.C. Cir. 1989)......................................................................4, 10

*In re Veiga*,
746 F. Supp. 2d 27 (D.D.C. 2010)...............................................................10, 12

*In re Wei for Ord. Seeking Discovery Under 28 U.S.C. § 1782*,
No. 18-MC-117-RGA, 2018 WL 5268125 (D. Del. Oct. 23, 2018).........................................3

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)...............................................................................passim

*Johnson v. Comm'n on Presidential Debates*,
869 F.3d 976 (D.C. Cir. 2017) .........................................................................2

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ................................................................................................ 1, 2

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co*,
  322 F.R.D. 1 (D.D.C. 2017) .................................................................................. 20, 22

*Merrimon v. Unum Life Ins. Co. of Am.*,
  758 F.3d 46 (1st Cir. 2014) ........................................................................................ 5

*Mohammad Hilmi Nassif & Partners v. Republic of Iraq*,
  No. 1:17-CV-02193-KBJ-GMH, 2021 WL 6841848 (D.D.C. July 29, 2021) ...................... 12

*Page v. Mancuso*,
  999 F. Supp. 2d 2696 (D.D.C. 2013) ............................................................................. 4

*Silver v. IRS*,
  531 F. Supp. 3d 346 (D.D.C. 2021) ............................................................................. 2

*Teva Pharms. USA, Inc. v. United States Food & Drug Admin.*,
  514 F. Supp. 3d 66 (D.D.C. 2020) ............................................................................. 2

*Thompson v. Trump*,
  --- F. Supp. 3d ---, No. 21-CV-00400 (APM), 2022 WL 503384, (D.D.C. Feb. 18, 2022) ....... 2

*United States v. Emor*,
  785 F.3d 671 (D.C. Cir. 2015) ................................................................................. 2

*United States v. Meyer*,
  462 F.2d 827 (D.C. Cir. 1972) ................................................................................. 4

*United States v. Olano*,
  507 U.S. 725 (1993) ............................................................................................. 6

**Constitutions and Statutes**

U.S. Const., Art. III ............................................................................................ 2

28 U.S.C. § 1782 ......................................................................................... passim

28 U.S.C. § 1782(a) .................................................................................... passim

28 U.S.C. § 1782(b) ............................................................................................. 5

**Court Rules**

Fed. R. Civ. P. 30(b)(6) .................................................................................. 19, 22

Fed. R. Civ. P. 37 ............................................................................................. 23

Fed. R. Civ. P. 44.1 ................................................................................................................ 12

**Other Authorities**

1964 U.S.C.C.A.N. 3782 ....................................................................................................... 11

## Argument

Per this Court's Orders, ECF 27, 29, & 32, Applicant Lucille Holdings Pte. Ltd.

respectfully submits this brief in further support of its Application for discovery.

## I.      Lucille has met the requirements of 28 U.S.C. § 1782(a)

*1.      Whether the statutory requirements of 28 U.S.C. § 1782(a) must be met before a
federal court has subject matter jurisdiction to address an application for
discovery under the provision (no).*

The statutory requirements of § 1782(a) do not affect the Court's subject-matter

jurisdiction.

Respondent Edge Funds Management LLC argues that "statutory standing" deprives the

Court of subject-matter jurisdiction if § 1782's requirements are not met. Edge's argument is

wrong and even deceptive. To try to support it, Edge selectively quotes *Lexmark Int'l, Inc. v.*

*Static Control Components, Inc*., 572 U.S. 118, 128 n.4 (2014), for the proposition that statutory

standing "is treated as effectively jurisdictional." ECF 33 at 4–5; *see id*. at 10–12. Edge takes

that quotation out of context, omitting portions of the same paragraph, and even the very same

*sentence*, that prove Edge's truncated excerpt to be misleading. Here is what *Lexmark* actually

says:

> We have on occasion referred to this inquiry as "statutory
> standing" and treated it as effectively jurisdictional. That label is
> an improvement over the language of "prudential standing," since
> it correctly places the focus on the statute. But it, too, is
> misleading, since "the absence of a valid (as opposed to arguable)
> cause of action *does not implicate subject-matter jurisdiction*, i.e.,
> the court's statutory or constitutional power to adjudicate the
> case."

*Lexmark*, 572 U.S. at 128 n.4 (citations omitted and emphasis added).

Since *Lexmark* was decided, courts have held—directly contrary to Edge's blatant misuse

of *Lexmark*—that "[d]espite its misleading name, 'statutory standing' is not jurisdictional in the

1

Article III sense ….” *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 984 (D.C. Cir. 2017) (Pillard, J., concurring in part). Statutory standing “is not jurisdictional but rather a question of whether Plaintiffs have a cause of action under the statute.” *Silver v. IRS*, 531 F. Supp. 3d 346, 363 (D.D.C. 2021); *accord Thompson v. Trump*, --- F. Supp. 3d ---, No. 21-CV-00400 (APM), 2022 WL 503384, at \*24 n.18 (D.D.C. Feb. 18, 2022) (“[S]tatutory standing is not jurisdictional.”).

     Unlike Article III standing, which does affect federal subject-matter jurisdiction, “statutory standing” is “not really about standing at all, in the sense that it limits a ‘court's statutory or constitutional *power* to adjudicate the case.’” *United States v. Emor*, 785 F.3d 671, 676–77 (D.C. Cir. 2015) (quoting *Lexmark*, 572 U.S. at 677). “Instead, statutory standing is nothing more than an inquiry into whether the statute at issue conferred a ‘cause of action’ encompassing ‘a particular plaintiff's claim’”—a merits issue. *Id*. (quoting *Lexmark*, 572 U.S. at 1387). In other words, statutory standing concerns the question whether Lucille “falls within the class” of interested persons “whom Congress has authorized” to seek discovery under § 1782. *See Lexmark*, 572 U.S. at 128.

     Lucille has such standing. Under § 1782(a), discovery may be sought “upon the application of any interested person.” “[L]itigants are included among, and may be the most common example of, the ‘interested person[s]’ who may invoke § 1782.” *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004). There is no genuine dispute that Lucille has statutory standing here because Lucille, as a party plaintiff to the contemplated—and now pending—foreign proceedings, qualifies as “any interested person” under § 1782(a) and so falls within the zone of interests covered by the statute. *See Thompson*, 2022 WL 503384, at \*25 (discussing statutory standing); *Teva Pharms. USA, Inc. v. United States Food & Drug Admin.*, 514 F. Supp. 3d 66, 92 (D.D.C. 2020) (same); *see infra,* § I.5.

> 2. *Whether, if not strictly jurisdictional, the statutory requirements of 28 U.S.C. § 1782 must nevertheless be met as of the date the application is filed in order for a federal court to have the authority to resolve an application for discovery under that provision (no).*

It is undisputed that the statutory requirements of § 1782(a) must be met before the Court can determine whether to exercise its discretion to permit discovery. Those requirements are: (1) the person from whom discovery is sought must reside in or be found within the district; (2) the discovery must be for use in a proceeding before a foreign or international tribunal; and (3) the application must be made by a foreign or international tribunal or by "any interested person." *In re Application of Leret*, 51 F. Supp. 3d 66, 70 (D.D.C. 2014). But the statute does not require those requirements to be met *only* at the time an application is filed and no later.

Nothing in § 1782 expressly addresses whether those requirements must be met only at the time the application is first filed. A few courts have taken such a position, but their holdings are neither binding here nor persuasive. *See, e.g.*, *Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123–24 (2d Cir. 2015); *In re Wei for Ord. Seeking Discovery Under 28 U.S.C. § 1782*, No. 18-MC-117-RGA, 2018 WL 5268125, at *2 n.1 (D. Del. Oct. 23, 2018). Those courts have tended to rely on a parenthetical dictum in *Intel*, which quotes a commentator saying that a proceeding need not be pending "'at the time the evidence is sought.'" *Intel*, 542 U.S. at 259 (citation omitted); *see Certain Funds*, 798 F.3d at 124; *In re Wei*, 2018 WL 5268125, at *2 n.1. But *Intel* never proposes to address whether § 1782's requirements must be met when the application is first filed. and no later. Neither § 1782's text nor *Intel* compels such a holding.

Both *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 249 (S.D.N.Y. 2018), and *In re Hornbeam Corp.*, No. 14-24887-MC, 2018 WL 1998912, at *1 (S.D. Fla. Apr. 27, 2018), for example—cases cited previously by Lucille, ECF 30 at 14–15, that Edge chooses

to ignore—address post-application indicia to determine whether § 1782(a)'s requirements were met. Those decisions make sense. If the application is all that is before the court, as in *Certain Funds*, 798 F.3d 113, then of course the court will consider nothing further. But just as this Court has the power to convert a motion to dismiss into one for summary judgment when it chooses to consider matters outside the pleadings, *Page v. Mancuso*, 999 F. Supp. 2d 269, 275–76 (D.D.C. 2013), it also has the inherent power to consider post-Application matters here. *Cf. In re FTC Line of Bus. Rep. Litig.*, 626 F.2d 1022, 1027 & n.29 (D.C. Cir. 1980) (discussing district court's inherent powers over its docket). Nothing in § 1782 evinces the intent to strip district courts of such power. And nothing in *Intel* does either.

In *In re Letter of Request from Crown Prosecution Service of United Kingdom*, 870 F.2d 686, 692 (D.C. Cir. 1989), in the context of holding that a foreign proceeding was reasonably contemplated, the D.C. Circuit noted that "[t]he requested evidence is adequately tied to now actual proceedings." It would be appropriate at any time before decision for this Court to consider evidence, or even take judicial notice, that a foreign proceeding had been commenced and to consider that fact in deciding whether to grant a § 1782 application.

Moreover, Edge concedes that Lucille could file a new application anytime it chooses. ECF 33 at 16. Because that is so, it follows that the Court may permit an application to be amended or supplemented by later filings. To hold otherwise "would be a useless formality and a waste of resources." *Cf. United States v. Meyer*, 462 F.2d 827, 831 (D.C. Cir. 1972). Edge openly prefers such waste because its goal here has, unfortunately, turned to obstruction. *See* ECF 33 at 16.

3.     *If those requirements are not jurisdictional and do not otherwise limit the authority of a federal court to address such an application, whether compliance with those requirements can be waived or forfeited by the target of the application (yes) and, if so, whether Edge Asset Management LLC has waived or forfeited such compliance (yes).*

The statutory requirements of § 1782(a) do not affect the Court's subject-matter jurisdiction and thus are waivable and forfeitable. The Court need not address the requirements *sua sponte* where objections have not been raised. For example, in *In re Application of Leret*, the court concluded that it had "authority to grant the application" where the parties simply did not dispute that the application was made by an interested person (e.g., statutory standing) and was for use in a foreign proceeding. 51 F. Supp. 3d at 70. That is consistent with the rule that questions of statutory standing are waivable and forfeitable.[1]

Statutory subsection (b) of § 1782 supports this view: "This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him." 28 U.S.C. § 1782(b). If, as Edge contends, subsection (b) protects respondents from waving objections under subsection (a) merely by producing information voluntarily, ECF 33 at 10, then it must mean that subsection (a)'s requirements are capable of being waived or forfeited. Otherwise, there would be no need for subsection (b) and, as Edge argues, it would be rendered meaningless. ECF 33 at 10.

---

[1] *See, e.g.*, *Hisp. Affs. Project v. Perez*, 206 F. Supp. 3d 348, 367 (D.D.C. 2016) ("The zone-of-interests test, … unlike the standing requirements of injury-in-fact, traceability and redressability, is not jurisdictional, and may be waived."), *on reconsideration in part*, 319 F.R.D. 3 (D.D.C. 2016), *affirmed in part & reversed in part* 901 F.3d 378; *see also In re Auld*, 689 F. App'x 623, 627 (10th Cir. 2017) ("Questions of statutory standing aren't jurisdictional and therefore may be waived through inadequate briefing." (citation omitted); *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 53 n.3 (1st Cir. 2014) ("[A]rguments based on statutory standing, unlike arguments based on constitutional standing, are waivable.").

Lucille does not contend (as Edge wrongly seems to suggest, ECF 33 at 10) that Edge has waived its objections under § 1782(a) simply because Edge has voluntarily produced a few token documents. (More accurately, before stonewalling, Edge voluntarily produced 389 self-selected documents, which it has subsequently stressed as evidence of its good-faith cooperation in discovery.) Rather, Lucille contends that Edge has waived (intentionally abandoned) or forfeited (unintentionally abandoned) objections by not raising them at the appropriate time. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (citation omitted)).

Edge correctly points out that the Consent Order of August 24, 2021 was entered "without prejudice to the Parties' rights, claims and defenses regarding the Application (including whether the Application is proper under 28 USC § 1782 or otherwise enforceable against Edge)." ECF 9 at 3; *see* ECF 33 at 9. But the same Order imposed on Edge a December 1, 2021 deadline to show cause why the Application should not be granted under § 1782(a). ECF 9 at 4 ¶ 4. Edge failed to file anything by that deadline.

Due to Edge's failure to file, the Court *sua sponte* entered a show-cause Order, which expressly required Edge on or before December 10, 2021 to show "in writing why (1) it should not be deemed to have waived or forfeited any opposition to the Application and (2) the Application should not be granted." ECF 12 at 2. In response, Edge asked the Court to deem its response timely, ECF 14 at 6–8—relief that Lucille did not oppose—but Edge otherwise focused on characterizing Lucille's discovery requests as unduly burdensome. *See generally* ECF 14. Edge's response did not address whether Edge had waived or forfeited objections under § 1782(a). Nor did Edge's response offer any clearly defined argument challenging whether Lucille's Application had met the statutory requirements of § 1782(a). *See generally* ECF 14. At

most, Edge arguably questioned whether foreign proceedings were reasonably contemplated, though the thrust of that argument concerned undue burden and "intrusiveness." *Id*. at 8–9. Even then, Edge did not focus on the Application's contents but rather on the post-Application fact that a foreign proceeding had yet to be instituted five months after this proceeding had been filed. *Id*. at 9. If Edge were going to contend that Lucille had failed to meet § 1782(a)'s statutory requirements via its Application, Edge's December 8, 2021 brief was the court-ordered time to do it—and Edge did not. Edge thus waived or forfeited its objections.

Out of caution, Lucille responded to Edge's timeliness concern. Lucille explained that it was an invalid objection because Lucille had always reasonably contemplated bringing a foreign proceeding and was not required to file such a proceeding within any particular time after filing its Application. ECF 17 at 11. Moreover, Lucille explained, with factual support, that it intended to file a proceeding no later than the end of March 2022. *Id*.; *see* ECF 17-1. Lucille pointed out that Edge's response otherwise did not contend that Lucille had failed to meet § 1782(a)'s statutory requirements or, for that matter, that *Intel*'s discretionary factors did not support discovery. Lucille thus concluded that Edge had waived or forfeited such objections. ECF 17 at 10–11.

Edge argued for the first time in its reply brief—to which Lucille had no right to respond—that Edge had not waived any objections to the statutory soundness of Lucille's Application (referring to Lucille's waiver contentions as "nonsense"). ECF 18 at 6. In that reply filed on January 6, 2022, Edge proceeded to newly raise certain challenges under § 1782(a), which the Court had ordered Edge to address no later than December 10, 2021. ECF 12 at 2. Not only did Edge fail to comply with this Court's order (including the direction to address the waiver issues itself), but Edge also contravened the well-established rule that "[g]enerally, arguments raised first in a reply brief are deemed forfeit." *Cox v. Saul*, No. 1:18-CV-02389-KBJ-

GMH, 2020 WL 9439356, at *14 n.22 (D.D.C. Sept. 1, 2020) (Harvey, J.), *R&R adopted sub nom. Cox v. Kijakazi*, 2022 WL 178953 (D.D.C. Jan. 19, 2022). Moreover, Edge has raised for the very first time in its most recent brief, filed on March 15, 2022, that Lucille failed to show statutory standing in its Application. ECF 33. Edge has waived or forfeited such challenges.

Regardless, even if Edge's vague statutory challenges were addressed on the merits, they make no difference. Edge stressed as somehow disqualifying the elapse of several months since the Application's filing without a foreign proceeding having commenced. ECF 18 at 7–8. But if, as Edge now argues, all that matters is the Application's content on the date it is filed, then Edge's delay argument is entirely irrelevant. And if that argument is not irrelevant, it necessarily means that the Court may consider post-Application indicia. As pointed out in prior briefing and below here, Lucille has presented considerable new indicia that a foreign proceeding is reasonably contemplated—and, in fact, foreign proceedings are now in existence. *See infra*, § I.5. Edge otherwise conceded that the Application should be granted but that the scope of discovery should be severely restricted and should come at Lucille's cost. *See* ECF 18 at 8–12.

The Court should conclude that Edge waived or forfeited the right to later object to the statutory propriety of Lucille's Application. It is also evident that Edge is willing to take inconsistent positions (as well as plainly unsupported ones) to impede further discovery.

> 4. *Whether notwithstanding whether the requirements of 28 U.S.C. § 1782(a) are jurisdictional or nevertheless must be met before a federal court has authority to address an application for discovery under the provision, at what point in time should that assessment be made—as of the date the application was filed, as of the date the court resolves the application, or as of some other date (the Court should address them as of the date it resolves the application).*

As explained above, *supra*, § I.2–3, nothing in § 1782's text or *Intel* require the Court to consider only Lucille's Application materials and to disregard subsequently filed indicia that the Application satisfies § 1782(a).

5.      *Whether Lucille (a) had met the requirements of 28 U.S.C. § 1782 as of the date of the application (yes), (b) had met the requirements of 28 U.S.C. § 1782 as of the date of the discovery hearing in this case (yes), or (c) will meet the requirements of 28 U.S.C. § 1782(a) as of some other date it proposes should be the relevant date (yes).*

Lucille met § 1782(a) in its Application and since then has strengthened its position. Foreign proceedings are now pending in Europe.

In support of its Application (filed on July 12, 2021), Lucille detailed facts supporting its proposed claims and explained how HAIL and other entities had violated legal duties owed to Lucille. ECF 1-2 at 4 ¶ 9. By focusing on matters other than the proposed claims themselves, Edge mischaracterizes the Rodney Lee Declaration, ECF 1-2. *See* ECF 33 at 13. Edge is wrong when it suggests that Lucille provided no "description of the legal theory" it would assert in a foreign proceeding. ECF 33 at 13, 15.

In fact, Mr. Lee specifically identified the causes of action that Lucille contemplated asserting against HAIL, the investment manager for the office building at 1350 I Street NW, Washington D.C. (the "Property"), and against HSBC Management (Guernsey) Limited ("HSBC Guernsey"), the director of 1350 Eye Street Limited: negligence, breach of fiduciary duty, and breach of contract.

Mr. Lee explained that Lucille was investigating and contemplated asserting "a cause of action against HAIL under English law for the negligent breach of its duty to continuously monitor the Property's performance and to implement available measure to improve Property Value." ECF 1-2 at ¶ 10. Lucille was investigating and contemplated asserting "causes of action under Guernsey or Singapore law against HSBC Guernsey, as director of 1350 Eye Street, for its negligence and breaches of fiduciary duties owed to [Lucille] and 1350 Eye Street Limited." *Id*. ¶ 11. Lucille was investigating and contemplated asserting causes of action under Guernsey law against HSBC Guernsey for "breaching its duty under 1350 Eye Street Limited's shareholder

agreement to keep Lucille duly informed as to all financial and business affairs of the Property and to provide details of any actual or prospective material change therein as soon as details were available, thereby causing Lucille to suffer preventable losses." *Id*. at 3–4 ¶ 12. And Lucille said it was contemplating asserting other potential claims. *Id*. at 4 ¶ 13.

Mr. Lee's declaration gave more than adequate indicia to show that Lucille's proposed claims described in its Application are reasonably contemplated and more than merely speculative. *See In re Letter of Request from Crown Prosecution Serv. of United Kingdom*, 870 F.2d at 691–92. Various courts have said that, when it comes to describing the proposed claims, all that is needed is "articulating a specific legal theory on which [the applicants] intend to rely." *In re Application of Furstenberg Fin. SAS*, 334 F. Supp. 3d 616, 619 (S.D.N.Y. 2018), *aff'd sub nom. In re Furstenberg Fin. SAS*, 785 F. App'x 882 (2d Cir. 2019); *accord In re Hornbeam Corp*., 2018 WL 1998912, at *3 (stating that "there were reliable indications where the parties articulated a theory of the case upon which they intended to litigate in a foreign country").

To require more—or as Edge suggests, to require Lucille to prove its claims in its Application—would place a cumbersome and unwarranted burden on district courts to learn and apply the laws of foreign nations. Just as § 1782 does not "direct United States courts to engage in comparative analysis to determine whether analogous [discovery] proceedings exist here," *Intel*, 542 U.S. at 263, United States district courts should not have to determine whether the proposed claims are valid under foreign law. If such efforts were required, § 1782 would say so. It doesn't. Instead, "the merits of the claims and defenses raised in foreign proceedings are matters better left for the foreign tribunals to resolve …." *In re Veiga*, 746 F. Supp. 2d 27, 37 n.8 (D.D.C. 2010).

To require Lucille to prove its claims in its Application is also contradicted by *Intel*'s acknowledgement that Congress intended for § 1782 to be used not only to seek discovery in

relation to pending proceedings, but also to be used in connection with pre-proceeding investigations. *See Intel*, 542 U.S. at 259 (noting that the legislative history "reflects Congress' recognition that judicial assistance would be available 'whether the foreign or international proceeding *or investigation* is of a criminal, civil, administrative, or other nature.'" (quoting 1964 U.S.C.C.A.N. 3782, 3789) (emphasis in original)). Because § 1782 may be used for pre-proceeding investigations, courts may not remain consistent with § 1782 and require fully matured recitations of proposed causes of action at the application stage.

Further, since Lucille filed its Application, it has detailed its proposed claims to the point of actually asserting them in a Guernsey court. *See* ECF 30 at 17–19. Lucille's post-Application filings prior to this brief provide far more detail than is required under § 1782 to indicate that a foreign proceeding is reasonably contemplated.

Contrary to Edge's position, ECF 33 at 14, the pending private Liquidation proceeding in Guernsey (disclosed on December 11, 2021) is relevant because Lucille, as an indirect investor in the company being liquidated (1350 Eye Street Limited), is an "interested party" under § 1782(a). ECF 1-2 at 2 ¶ 4; ECF 10 at 1–2. "The text of § 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant.'" *Intel*, 542 U.S. at 256 (citation omitted). It is thus appropriate for Edge to obtain documents from Edge for use in that proceeding, which is occurring. *See* ECF 30 at 17–19; ECF 30-1 at 2 ¶¶ 5–6; ECF 17-1 at 3 ¶ 6; ECF 11.

Edge merely speculates that Lucille's proposed claims as detailed in its letters before action, ECF Nos. 19-1 & 19-2 (filed on January 11, 2022), do not state a claim under Guernsey law. ECF 33 at 15–16. If Edge wishes to rely on Guernsey law to contend that Lucille fails to state a claim under Guernsey law, Edge must prove the relevant contents of that law, such as by submitting testimony from an expert in Guernsey law, and then analyze Lucille's claims with

respect to it. *See* Fed. R. Civ. P. 44.1; *Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, No. 1:17-CV-02193-KBJ-GMH, 2021 WL 6841848, at *9 (D.D.C. July 29, 2021) (Harvey, J.). Having made no attempt to do so, Edge cannot be taken seriously when it says Lucille fails to state a claim.[2]

Regardless, § 1782 does not require or even permit district courts, in deciding the propriety of a § 1782 application, to assess the merits of foreign claims. As stated above, "the merits of the claims and defenses raised in foreign proceedings are matters better left for the foreign tribunals to resolve …." *In re Veiga*, 746 F. Supp. 2d at 37 n.8. Instead, foreign proceedings need only be reasonably contemplated. As Lucille has previously explained (without any effective rebuttal from Edge), the standard for describing a proposed foreign claim is not high and certainly does not require the proposed plaintiff to prove its claims in the application (or at any other time). *See* ECF 30 at 8–10.

Further, legal proceedings are now pending against HAIL and HSBC Guernsey in the Royal Court of Guernsey and against HAIL in England. Lucille has previously explained that, to avoid potential time-bar issues, it intended to file proceedings against HAIL and HSBC Guernsey no later than the end of March 2022. ECF 17 at 9 (filed on December 22, 2021). Lucille has now done so.

First, on March 11, 2022, Guernsey counsel for Lucille filed in the Royal Court of Guernsey an Application for leave to serve a claim against the English company HAIL out of the Guernsey jurisdiction, thus commencing a judicial proceeding against HAIL. *See* Third Decl. of Robert F. Parsley ¶¶ 2–3 & Ex. 1. At a hearing on March 18, 2022, the Royal Court of Guernsey granted the application and set a return date for HAIL to appear on April 22, 2022. *Id*. The

---

[2] In *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d at 249, the court considered a "detailed demand letter" as an indicium that a foreign proceeding was reasonably contemplated.

Summons is being served on HAIL in London, England. *Id*. On March 15, 2022, Guernsey counsel served a Summons on HSBC Guernsey, thus commencing a judicial proceeding against HSBC Guernsey. *See id*. ¶ 4 & Ex. 2. The return date for HSBC Guernsey's appearance is also April 22, 2022. *Id*.[3]

In the now pending proceedings in the Royal Court of Guernsey, those papers state in detail the factual basis for Lucille's claims against HAIL and HSBC Guernsey, the causes of action being asserted, and the damages sought. *See* Third Parsley Decl., Exs. 1–3. Lucille explains how in 2010 it was induced to invest in the Property (which had been built in 1989) and that the goal was to maximize the Property's value for resale. *Id*., Ex. 3 at 1–2. Edge itself invested $2.6 million in the Property and was hired both to assess financing and resale strategies and to "actively manage the real estate investment, overseeing the day-to-day activity of property management and tracking adherence to the investment strategy, asset business plan and its overall performance." *Id*., Ex. 3 at 3 ¶¶ 9–10. Edge did so under the supervision of and subject to direct by HAIL and HSBC Guernsey. *Id*., Ex. 3 at 3–4.

Instead of selling the Property as expected, however, at Edge's recommendation the lending for the Property was extended and was refinanced during the 2015–2018 period. *Id*., Ex. 3 at 4–7. Edge's recommended capital-improvement strategy approved by HAIL, however, was insufficient to enable the Property to remain competitive in a difficult Washington D.C. commercial real-estate market, in which newly built properties with far better amenities rendered the Property undesirable to tenants. Third Parsley Decl., Ex. 3 at 7–9. The investment went into default, resulting in foreclosure in 2021 and total loss to investors. *Id*., Ex. 3 at 10.

---

[3] Edge mischaracterizes the February 22, 2022 hearing when it suggests that Lucille "admi[tted] that it does not have enough to file a case" against HAIL and HSBC Guernsey. ECF 33 at 16. To the contrary, counsel for Lucille stated that it intended to file such an action in March 2022 regardless of whether it received further information from Edge before then—as Lucille has in fact now done.

Lucille complains that HSBC Guernsey, as the sole director, Administrator, and Managing Entity for the investment entity, 1350 Eye Street Limited, breached duties owed to Lucille to exercise due care, to exercise independent judgment, and to fulfill fiduciary duties. Third Parsley Decl., Ex. 3 at 10–12. In particular, HSBC Guernsey failed, among other things, to "exercise appropriate strategic oversight of Edge and allowed Edge to negligently decrease the value of the Property," "inappropriately delegated its management of the Property to Edge and failed to properly appraise Edge's performance in managing the Property," and "failed to take any or adequate steps or put in place proper measures to protect the value of the Property or replace Edge when Edge's performance harmed the value of the Property." *Id.*, Ex. 3 at 12. Similarly, Lucille complains that HAIL violated duties of due care and fiduciary duties owed to Lucille to continuously monitor the Property's performance and to oversee Edge. *Id.*, Ex. 3 at 13–16. As a result of these breaches of Guernsey or other law, Lucille lost not only its $4.1 million investment but also millions of dollars in expected profits. *Id.*, Ex. 3 at 16–17.

Second, on March 21, 2022, English litigation counsel for Lucille filed a claim by Lucille against HAIL in the High Court of Justice for England and Wales (Claim No. BL-2022-000492). Third Parsley Decl., ¶ 7 & Ex. 5. In that proceeding, Lucille seeks damages from HAIL for breach of duty of care and breach of fiduciary duty relating to the Property. *Id.*, Ex. 5 at 1.

Lucille seeks to use documents and information obtained from Edge to support Lucille's claims in these foreign proceedings.

## II.   The discovery Lucille seeks is reasonable and should be permitted

The further discovery sought by Lucille is reasonable and the Court should require Edge to provide it at its own cost.

*1.     The Court should order Edge to produce the requested emails and attachments*

With its Application, Lucille provided a proposed document subpoena. ECF 1-3. In

November 2021, after Lucille had reviewed the few hundred documents Edge had produced,

Lucille narrowed its document requests to 10 specific categories of documents. *See* ECF 17-2 at

3 ¶ 5. The tenth category sought communications relevant to HAIL and HSBC's Guernsey's

knowledge and oversight of Edge's conduct as asset manager for the Property:

> Category 10: Emails, letters, and other communications with
> HSBC Alternative Investments Limited or HSBC Management
> (Guernsey) Limited concerning (i) the leasing, sale or
> improvement strategy for the Property, (ii) the business plans and
> market trends for the Property, (iii) the Property's decline in value,
> (iv) recommendations and instructions concerning the leasing, sale,
> and major improvements to the Property, and (v) fees paid to Edge,
> HSBC Alternative Investments Limited, and HSBC Management
> (Guernsey) Limited in relation to the Property

ECF 21 at 3–4; *see* ECF 17-2 at 11, 13.

Edge objected to this request. *See* ECF 21 at 4–6. Edge said it had already produced all

material "documents of substance" responsive to Lucille's requests. In a letter dated December

16, 2021, counsel for Edge represented that "*anything of substance* that may involve Edge and

HSBC are in the request for approval files *which we provided*, and that the additional material

you also requested – business plans, appraisals, financial statements, and loan documents – *were*

*part of those files*." ECF 17-2 at 10 (emphasis added). "We gave you those files because *that is*

*the only material information* Edge may have in its possession that concerns your potential

claims about the HSBC's entities' actions involving 1350 I Street …" (the "Property"). *Id*.

(emphasis added).[4]

---

[4] As for document-request categories one through nine, Edge CEO Gary Siegel declared that
Edge had either produced everything or that the requested documents did not exist. ECF 14-5 at
3–4; *see* ECF 17-2 at 11–13; ECF 18-1 at 3–9. Lucille has accepted those representations—
which are now in question—while reserving the right to test them through further discovery.
ECF 21 at 1–3.

In a brief filed on January 6, 2022, Edge made similar representations to the Court. "Edge has told Lucille about the substantive information Edge has to produce, *has produced it*, and agreed to produce some additional documents to fill in a few gaps." Edge Br., ECF 18 at 1 (emphasis added); *see id*. at 3–5, 22. More specifically, as to Category 10, Edge represented that "Edge *produced all substantive communications already on September 30, 2021*, all of which would be part of the request for approval files." *Id*. at 19 (emphasis added). Edge's CEO, Gary Siegel, despite hedging in his cleverly worded declaration, impliedly agreed: "Edge responded by pointing out that it already produced all substantive communications on September 30, 2021, all of which would be part of the request for approval files." ECF 18-1 at 1, 10. Edge said it would nonetheless produce the additional requested "non-substantive" documents only if Lucille agreed in advance to pay Edge's costs for the production, which Edge estimated to be $100,000. ECF 17-2 at 7–8, 13–14; ECF 18-1 at 10–11.

Edge explained that the communications Lucille sought in Category 10 were contained in two electronic email folders devoted to the Property maintained respectively by Edge officers Mr. Siegel and Tiffany Sanders. ECF 18-1 at 11 ¶ 13. The two folders were duplicative because, as Mr. Siegel testified, "Ms. Sanders would almost invariably copy me on anything, so it should be found also in my folder." *Id*. Edge offered to have Edge search those folders, at Edge's cost, but only by limiting responsive documents based on multiple, restrictive search terms. ECF 18-1 at 11–12 ¶ 13. Otherwise, Edge expected Lucille to pay for all production costs. *Id*. at 12 ¶ 14; *see id.* at 26–27. Edge has rejected Lucille's proposal that Edge simply search for and produce emails to and from 10 identified HSBC custodians or that Edge produce all emails tagged "1350," a subject tag that Edge had customarily used for communications relating to the Property. ECF 17 at 19; *see* ECF 21 at 4–8; Third Parsley Decl. ¶ 5.

On January 27, 2022, counsel for Edge revealed that, in his estimation, the Sanders and Siegel email folders combined contained less than 10,000 documents, duplicates included. *See* Third Parsley Decl. ¶ 5; ECF 24 at 4. During the February 22, 2022 hearing, Edge's counsel, Mr. Tolchin, also revealed that to date he had not even reviewed the contents of one of the email folders, and thus he could not possibly have known whether all "substantive" documents had already been produced, as both he and Mr. Siegel has represented to the Court. (When challenged by the Court on this point, Mr. Tolchin stated that he had "overspoken.")

On the morning of March 4, 2022—the day Lucille's opening brief was due in the current round of briefing—Mr. Tolchin revealed that total number of emails contained in Mr. Seigel and Ms. Sanders' electronic folders was no more than 2,400 (approximately 1,200 in each). ECF 30-1 at 3, 5 & ¶ 11. With duplicates removed, the total number of emails is likely far closer to 1,200 than to 2,400. Lucille finds it remarkable that Edge has caused Lucille to spend tens of thousands of dollars fighting to obtain documents from a database that Edge has only lately disclosed to be far smaller than Lucille had originally been led to understand.

It is also remarkable that Edge expects Lucille to pay not only Mr. Tolchin's rate of $445 per hour for review and production of those emails, but also to pay Mr. Siegel his supposed hourly rate as an attorney ($525 per hour) when he is an employee of Edge. ECF 33 at 19 & n.2. At Mr. Tolchin's rate, his estimated cost for the production of the emails (without even first deduplicating them) ranges from $16,687 (37.5 hours addressing 1,500 emails) to $26,700 (60 hours addressing 2,400 emails), which Edge demands that Lucille pay in full. *Id*. at 19–21. At Mr. Siegel's rate, the same production (also without first deduplicating the emails) ranges from $19,687 to $31,500. *Id*.

Those estimates are not just unreasonable; they are entirely divorced from the reality of eDiscovery industry standards. Edge has relied solely on its own, self-serving and uneducated

estimates. As explained in the Declaration of John Thacher, a lawyer by background and the

Director of eDiscovery Managed Review Services for Ricoh USA, Ricoh USA estimates that it

could review and produce 2,400 emails and attachments for a cost ranging from $1,371 to

$2,742. John Thacher Decl. ¶¶ 2–4, 8. And that is without first deduplicating redundant emails,

as is customary. Deduplication would reduce those estimated costs based on the number of

redundant documents excluded. *Id*. ¶ 9. With significant deduplication, Ricoh USA or another

similar vendor could potentially perform Lucille's requested document production for under

$1,000. That is orders of magnitude lower than the $100,000 Edge had initially demanded.

Edge continues to mischaracterize Lucille's proposed search options as "overbroad" and

as seeking irrelevant materials—objections that by now should ring hollow. ECF 33 at 21. The

Court should order Edge to produce all emails (with attachments) from the two folders.

Alternatively, the Court should order Edge to produce all emails (with attachments) from

the two folders that include the term "1350." In the further alternative, the Court could order

Edge to produce all emails (with attachments) to or from the following HSBC-related

individuals: Paul Ruse; Stephen Rouxel; John Oldham; Daniel Samson; Jon Evans; Christopher

Allen; Guy Morell; Tim Williams; Russell Sykes; and Ian Ratledge.

Whatever the protocol, Edge should be required to deduplicate redundant documents

before producing the documents. And Edge should be required to use a vendor to ensure

accuracy and reasonable cost.

Moreover, given Edge's conduct, Lucille no longer trusts Edge's representations to

Lucille or to the Court. *See* Third Parsley Decl. ¶ 5; ECF 30-1 at 3 ¶ 10. In particular, as to

document-request categories one through nine, Lucille no longer is willing to take at face value

Mr. Siegel's declaration that Edge has either produced everything or that the requested

documents did not exist. *See* ECF 14-5 at 3–4; ECF 17-2 at 11–13; ECF 18-1 at 3–9. For that

reason, Lucille reserves the right to seek follow-on discovery, including regarding Edge's creation, maintenance, preservation, and production of documents.

      2.      *The Court should order Mr. Siegel and Ms. Sanders to give individual depositions*

      Edge spills pages worth of ink on irrelevant objections to Lucille's proposed Rule 30(b)(6) deposition notice to Edge. ECF 33 at 22–28; *see* ECF 1-4 (notice). (Edge also takes the patently unreasonable position that it would potentially take upwards of 2,155 hours for Edge representatives to prepare to answer the topics in the 30(b)(6) deposition notice, which would take a year to complete and, at Mr. Siegel's putative hourly rate of $525, would cost over $1.1 million (specifically, 2,155 hours x $525 per hour = $1,131,375). *See* ECF 33 at 22–27; ECF 33-1 at 3–8.)

      At the February 22, 2022 hearing, counsel for Lucille announced that, to lessen any burden on Edge relating to preparing for the company deposition, Lucille would instead be willing to take the individual depositions of Mr. Siegel and Ms. Sanders. Post-Application developments have shown that Mr. Siegel (who has provided multiple declarations filed in this matter) and Ms. Sanders possess personal knowledge of the matters Lucille considers relevant to its claims against HAIL and HSBC Guernsey. In its brief filed on March 4, 2022, Lucille stated that it now wishes to depose Mr. Siegel and Ms. Sanders individually: "In light of the February 22, 2022 discovery hearing, to reduce the burden of preparation on Edge, Lucille amends its deposition request to request the individual depositions of Gary Siegel and Tiffany Sanders. The Court should order those depositions to take place." ECF 30 at 20. Edge simply ignores that amendment, choosing instead to attack a straw man.

      The Court should order the individual depositions of Mr. Siegel and Ms. Sanders to occur. That will eliminate the burdens that would otherwise be imposed on them to serve as company representatives at a 30(b)(6) deposition based on the noticed topics, ECF 1-2.

> 3. *Edge fails to show that the requested discovery would be unreasonable, disproportional, or unduly burdensome and it should be required to provide discovery at its own cost*

The Court should hold that all the discovery Lucille currently seeks is reasonable and proportional to the magnitude of Lucille's multi-million-dollar dispute. *See* ECF 17 at 8–10. Proportionality includes "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co*., 322 F.R.D. 1, 6 (D.D.C. 2017). Insofar as Edge makes no attempt to address these factors, ECF 33, if fails to meet its burden of opposing the discovery sought.

The discovery sought is important and relates to a significant amount in controversy. The foreign proceedings concern the loss of a $4.1 million investment plus millions in lost profit by Lucille in the context of a $90 million investment gone bad in a $208 million office building. ECF 1-2 at 2 ¶ 4. Edge and its officers Mr. Siegel and Ms. Sanders, which have direct knowledge of facts central to Lucille's claims against HAIL and HSBC Guernsey, are material witnesses.

Edge suggests that Lucille need not seek evidence directly from Edge because Guernsey procedure permits Lucille to seek discovery directly from HAIL and HSBC Guernsey (and so the Application is just a "fishing expedition" or a bluff). ECF 33 at 12, 17, 20, 28. That is merely a diversion. Edge's rhetoric aside, nothing genuinely shows that Lucille's Application is just "pretextual" or a "bluff." *See Intel*, 542 U.S. at 266; *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d at 250.

Lucille needs and should be permitted to obtain discovery from Edge and its officers to learn first-hand how Edge managed the investment and what strategies it recommended to HAIL

and HSBC Guernsey. Although many communications possessed by Edge might also be possessed by HAIL and HSBC Guernsey, there is no guarantee that HAIL and HSBC Guernsey have preserved all the same communications and other documents that Edge has preserved. And in any event, "'[i]f Congress had intended to impose … a sweeping restriction on the district court's discretion, at a time when [Congress] was enacting liberalizing amendments to the statute,'" by limiting production to materials that could not be found in the foreign jurisdiction, Congress "would have included statutory language to that effect.'" *See Intel*, 542 U.S. at 260 (citation omitted). It did not.

Moreover, without information obtained directly from Edge, Lucille's understanding of the facts relating to its claims would remain incomplete. For example, Lucille has already pointed out that HAIL and HSBC Guernsey misrepresented to Lucille the reasons for the Property's decline in value, failing to disclose that "several losses of tenants were influenced by the Property's failure to maintain current quality as a Class A trophy property in terms of amenities." ECF 19-1 at 5 ¶ 2.24; ECF 19-2 at 4 ¶ 2.23. Testimony and documents from Edge are necessary to test not only the degree to which HAIL and HSBC Guernsey breached duties to Lucille by failing to properly oversee Edge, but also to test the accuracy of representations that HAIL and HSBC Guernsey have made to Lucille and other investors.[5]

The burden or expense of the proposed discovery is justified and comes nowhere close, as Edge suggests, to being "'so overbroad as to be unintelligible.'" ECF 33 at 21 (citation omitted). Lucille has shown that it should cost Edge less than $3,000 to produce the 2,400 or fewer emails at issue. *See* Thacher Decl. Edge, which maintains offices in Washington D.C.,

---

[5] The fact that Edge might fear incurring potential civil liability by disclosing information (as indicated by Edge's counsel at the February 22, 2022 hearing) is not a material concern. In any event, Edge is not a target defendant for Lucille's claims. *See* Third Parsley Decl., Exs. 3 & 5.

New York City, and Miami, touts itself as managing over 2.4 million square feet of properties and as having been involved in over $1 billion worth of commercial real-estate transactions. *See* ECF 1-2 at 3 ¶ 6; *id*. at 8, 10, 13–14, 16–18; *id*. at 16 ("EDGE has purchased more than $1.3 billion of prime real estate since 2009").

Lucille also asks to take two individual depositions of Edge's CEO Mr. Siegel and Vice-President Ms. Sanders, who were directly involved with the Property and related communications. *See* ECF 18-1 at 1; Third Parsley Decl., ¶¶ 5–6 & Ex. 4. That obviates the burden of preparation associated with a 30(b)(6) deposition.

Edge's position—which Edge continues to try to paint as somehow cooperative, ECF 33 at 1, 19—would, if endorsed, "disserve § 1782(a)'s twin aims of 'providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts.'" *Intel*, 542 U.S. at 252 (citation omitted); *see id.* at 269 (discussing Congress's "basic cooperative objectives in enacting" § 1782) (Breyer, J., dissenting)); *In re Application of Leret*, 51 F. Supp. 3d at 70.

Finally, the Court should hold that Edge "has failed to rebut the presumption imposed by the Federal Rules of Civil Procedure that it should bear the cost of complying with [Lucille's] proposed discovery." *See Oxbow*, 322 F.R.D. at 11. Lucille has consistently indicated a willingness to share the reasonable costs of hiring an eDiscovery vendor, if needed. *See, e.g.*, ECF 17 at 21; ECF 24 at 5. Meanwhile, Edge has already forced Lucille to expend on legal fees amounts far greater than Ricoh USA's estimated costs for the proposed production. Edge's own legal costs surely have also already far exceeded the costs that it would have incurred had it merely reviewed and produced the emails at issue. That evinces a motive to obstruct.

Given the minimal expected burden and costs involved in producing less than 2,400 emails and attachments, *see* Thacher Decl. at 2–3, and the giving of two individual depositions,

the Court should require Edge to bear all its own costs, including legal fees and the costs of an eDiscovery vendor, associated with the requested document production and depositions.

## III.   Conclusion

Under § 1782 and the *Intel* factors, the Court should grant Lucille's application. The Court should require Edge to produce its emails as requested above within a reasonable time, using an eDiscovery vendor to do so to ensure accuracy and reasonable cost. The Court should order that the individual depositions of Edge officers Mr. Siegel and Ms. Sanders shall take place within a reasonable time, after the additional documents have been produced. And the Court should order that Edge must provide this discovery at its own expense.

Edge reserves its rights to seek follow-on discovery and to seek sanctions against Edge under Federal Rule of Civil Procedure 37 and the Court's inherent authority.

Respectfully submitted this 21st day of March 2022.

*/s/ Daniel S. Ward*
Daniel S. Ward (DC Bar # 474339)
WARD & BERRY, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102
(202) 331-8160
(202) 505-7100 Fax
dan@wardberry.com

Ryan A. Kurtz, admitted pro hac vice
MILLER & MARTIN PLLC
1180 W. Peachtree St., Suite 2100
Atlanta, Georgia 30309
Telephone: (404) 962-6100
ryan.kurtz@millermartin.com

Robert F. Parsley, admitted pro hac vice
MILLER & MARTIN PLLC
832 Georgia Ave., Ste. 1200
Chattanooga, TN 37402
Telephone: (423) 756-6600
bob.parsley@millermartin.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify, that on this 21st day of March, 2022, the foregoing document was served

via the Court's ECF system upon the following:

> Edward J. Tolchin
> OFFIT KURMAN, P.A.
> 7501 Wisconsin Avenue, Suite 1000W
> Bethesda, MD 20814
> etolchin@offitkurman.com
> *Counsel for Respondent,*
> *Edge Funds Management LLC*

Dated: March 21, 2022

*/s/ Daniel S. Ward*